Good morning and welcome to the Ninth Circuit. I'm Judge Nelson and it's a pleasure to be with my colleagues, Judge Bybee and Judge Forrest, and we welcome you to the Court today. We're grateful for Court staff who have helped us run this smoothly, notwithstanding some weather setbacks and other logistical issues. We ask that during arguments you just pay attention to the clock, let us know if you want to reserve time, and then sum up as your time is expiring. Also know that the first case I expect we'll need all the time. For those on the video, you don't need to use all your time in the second case, but we're anxious to hear whatever the parties want to say in defense of their clients. We're ready to proceed with the oral argument calendar. There's one submitted case, Wang v. Bondi, and the first case set for argument is Crow v. Averill, case number 25-1400. Good morning, Your Honors, and if I may reserve three minutes for rebuttal. May it please the Court, Christopher Bonk on behalf of Petitioner Steven Crow. In this matter, Your Honors, in finding for the government on summary judgment, the District Court engaged in reversible errors. A few points on which I'd like to highlight in particular this morning. The first being on Mr. Crow's reprisal claim and ruling on summary judgment. The District Court misapplied the standards on establishing adverse employment actions, wholly failed to give any reasoning or analysis regarding proposed removal as an action, and improperly excluded the investigation from its assessment. Second, on the hostile work environment claim. Can we back up? Let's just take this one at a time. I mean, this is, you know, sort of complicated as you get into all these issues. So on the first one, on the retaliation, on the discrimination and retaliation point, I guess, you're combining those together, right? To an extent, Your Honor. There's a few points that do commingle there, but there's, I think, larger issues to address with very glaring deficiencies within the retaliation decision itself. So the only thing before us is the pre-termination issues, right? Because the termination we already held was not discriminatory. That's been disposed of, Your Honor. Yes, correct. It's only the pre-termination issues. And so to what degree does that prior decision inform our decision here? And how does that narrow the scope of what we're looking at? So it minimally impacts it here for practical effect, Judge. And of course, there was an argument below on the law of the case and that impacts it. The district court did dispose of that here. I think that was disposed of at the end of the day correctly. That was correctly set aside. And I'm not suggesting that law of the case controls. I think that's clearly true. I mean, our prior case clearly said pre-termination goes back, but they made it findings that, you know, he was properly terminated. And so really all you can, the only argument it seems to me that's left for you is that the investigation was opened. There was a discriminatory basis for the investigation to be opened. Would you agree with that assessment? I would not, Judge, because we have a host of pre-termination issues here. And the decision maker at issue in the earlier case for the decision to terminate is, is, is. Balsak. No, so Ballesteros was not the deciding official. So Ballesteros was the proposing official and his animus is at issue here. Oda's animus is at issue here. They were not the deciding official for the termination that was resolved. So their animus. Right, but that goes to opening the investigation. Doesn't that roll in your, if I understand your argument, your argument is Oda had animus and Oda was influential in opening the investigation. And so therefore there was discrimination here. Oda was influential in the investigation. The actual initiation of the investigation was Ballesteros assigning Oda to initiate that. But their animus is both at issue in this, absolutely. Okay, so Oda wasn't responsible for opening the investigation. Sewell was, I guess. Sewell filed the complaint against Crow. So, okay, so let's take that apart then. Because if Oda, so you were complaining about the investigation and that Oda did it. Oda, it was handed over to him. He did the investigation. He had animus. Therefore, here's the problem though. That's where it seems to roll into our prior case because our prior case said the results of the investigation are indisputable. So, so the, the, and I think that's a really important point for our purposes here for the district court gets into error in this within the assessment of, of, of kind of justifying its, its ultimate finding on summary judgment. The district court looks at the results of the investigation. We don't, aren't looking at the results of the investigation as much here. It gets into a little bit into the proposal itself, but there's more nuance on that and the actual timing on that that we'll get to in a moment, I think, or I'd like to get to in a moment. But the, the, as far as the initiation of the investigation, the discriminatory animus, retaliatory animus, and kicking off the investigation. That's why I'm asking you these questions. Is it that the investigation was initiated or is it how the investigation was conducted? It is both, Your Honor. It is both. As to how the investigation was conducted, I don't understand how that claim can proceed. Because when this court remanded this matter back down, it remanded the pre-termination actions, which included the investigation itself, and this was further developed. There is additional evidence in the record, additional statements, additional declarations at issue, additional briefing on that issue that I think is pertinent here. Let's go to opening the investigation, because that seems to be clearly available. But I don't understand your claim for opening the investigation. Sewell files a complaint. Are you, are you suggesting that that complaint should not have been investigated? No. And, and I think it's, it, it very well could have been investigated. The issue is part, and this ties into, of course, the, the comparator issue as well, because that decision to initiate an investigation against Crow and not against Oda, that ties into that comparator, whether or not they did, they did initiate an investigation into Oda. They did not. There was no investigation into Oda. There was simply just a, a written reprimand. And that's part of the issue here. The Oda, there's a complaint against Crow and there's a complaint against Oda. Ballesteros gets instruction to look into it, the same instruction for both. Ballesteros initiates an investigation into Crow, appoints Oda as the investigator. No investigation is initiated into Oda. Instead, Ballesteros simply issues him a written reprimand and says, we're done with it. But there is a district treatment. They're both of the same, similar situated otherwise. And there's the, this very clear distinction of fact, and this is one of the really important points, I think, on these, these disputes of fact that the, the district court ultimately weighs in favor of the movement, the government in this matter, on that. The district court in making that comparator determination between Oda and Crow, why one was investigated, why one wasn't, looks at, flags this, this concern about, well, well, one claim was, was Sewell being, being concerned about his safety, fearful of his safety. And that's the distinction. Well, we think that's, that's very much in dispute. That's a, that's an incredibly important material fact and dispute here. And I think the, the Sewell's complaint itself against Crow in, in Volume 2 at 269, Sewell says, he complains about not that he's going to be impacted or physically impacted by, by Crow, but rather the central point of the complaint is spreading rumors. He's saying, he's saying things I don't agree with. I think he's lying. And what Sewell actually says is that Sewell himself, I, Sewell, will not be able to control my actions around Crow when he's spreading lies. It's not that Crow's coming after him, that hearing Crow's lies, he's going to go after him. And Oda's assigned to investigate this. Of course, that, that is your strongest point. I, I failed to understand. I'm interested in hearing from this. I do not understand why Oda was assigned to investigate this. Like that, that just defies common sense, but, but said, I don't know whether that gets you where you need to go, but setting that apart, I, I guess I'm still struggling to understand why this is discrimination. I mean, there are two different complaints that are raised. One of them, you know, he, I mean, he was reprimanded. Like, do you think, you think that is the discrimination that there was no investigation or that you think Oda should have been terminated in the same way that, that Crow was terminated? I think it, it more aligns with that should have been investigated. So if there's two complaints, which are, are functionally equivalent in our perspective, Bell, Osteros gets the same. They're not functionally equivalent. I mean, for purposes of comparators, what we're, we're pushing their judge. I guess that's what I have our time seen because it seems to me they have discretion to look at comments that are made. I mean, that's very different from whether you're engaging in sexual activity in the workplace. Well, and that's, I think a really important point is, is that engaging in sexual activity in the workplace, that, that is when it only comes in later, later. Exactly. So that is that if an investigation hadn't been opened up, this would have been more limited. And that's part of the, that gets into this issue. And I think this is kind of a common trend against these types of issues, these retaliation claims about this question of the initiation of the investigation, it turns into a fishing trip and additional information is gathered up in the processing of the investigation. That's where we get to later in this, right? Which is additional claims are dredged up as in the conduct of the investigation. But the initiation of the investigation is solely centered on Sewell's complaint against Crow. And that's where we have correct, true to what you, you stated earlier, Judge. One of the issues is the, in our position, the investigation goes off the rails. OTA brings it off the rails. It is centered. Well, I think we got to be careful. I, let me clarify what I was saying. I think it's wrong that they put OTA in charge of it, but I'm not sure I agree with your assessment that it went off the rails. I mean, everything, I mean, we've basically said as much that everything that came out was grounds for termination. Sure. And I understand that, Judge. And I didn't mean to misrepresent, what I'm indicating is that, that the convey is that our position is that the investigation, the conduct of the investigation, there are issues with it. And, and, and to that point, there are, and actually, well, I think we've, we've discussed that, but I wouldn't have went on that. One of the things that I did also want to point out in particular, as I see my time is, is expiring quickly here, is flagging a particular passage on the district court's decision. And going back to this, this issue of these, these throughout the decision, there's a reliance by the district court on finding for the movement on material disputed facts and yet ruling in summary judgment anyway. So at volume one, page 38, the district court actually concedes there on the government's articulated reasons for its actions. It says, quote, these facts raise a genuine issue of material fact as to whether defendant discriminated against plaintiff. And yet then rules in favor of the movement anyway on summary judgment. Uh, the, it concedes that there is a genuine issue of material fact as to whether there's discrimination and then still fines for the government. Uh, I think that in itself. But doesn't that, I, I, I'll have to go back and look at that, but it seems to me that that's not necessarily inconsistent with the McDonnell Douglas burden shifting standard. I, I think that, I think that's a concession at least from our perspective, Judge, at least in the context there, it is a concession that there are material facts and disputes such that summary judgment should not be granted. Uh, another important point that I do want to flag here, uh, is with respect to the hostile work environment claim. Um, the district court and the decision there at volume one, pages 45 to 48, uh, exclusively analyzes the use of these slurs. There's no consideration given to the other actions at issue and assessing whether the conduct was severe or pervasive. The hostile work environment claim is not just use of slurs. The hostile work environment claim are all of the pre-termination actions that were remanded. The placement on admin detail, the removal of police powers, the investigation, the proposed removal, all essential parts of the hostile work environment claim, and that's memorialized in the, uh, uh, transcript that we have, of course, of the MSJ, uh, uh, discussion and oral argument there, uh, volume two, pages 81 and 82, and those are explicitly lined out in the discussion with the judge. The judge does not address that at all. The district court does not address the majority of the claims at issue in the hostile work environment matter, uh, and, and yet still. I guess I'm not, I'm not sure I follow entirely the argument that you're just making because at the point that, that disciplinary action starts happening, the, you know, changing of duties and removal of police powers, then there's these other things that, um, came out in OTA's investigation are known. So how do you tie those disciplinary actions directly to a hostile work environment when you've got intervening facts coming into the story at that point? Um, because, uh, and I'd see my primary time if I may respond there. You can always answer our questions. I figured as much, but always fair to check. Um, judge, the, one of the concerns that we have about the hostile work environment assessment that ties into that answer, and I hope this answers your question, is, uh, it needs to be a, a, a broad review of the circumstances here. The, the district court narrows this down. Um, there is a host of taken, uh, across, uh, the, the entirety of all these pre-termination actions. Those must all be taken as a whole and assessed into this, whether the- But that's the nature of my question. It seems like you're trying to narrow it and say that, you know, because of some things that happened earlier on in the story that more directly tie perhaps to, um, the hostile work environment theory that you're advancing, it seems to ignore that we've got, you know, an investigation that happens and facts that are, that come to light about sexual misconduct in the workplace and those sorts of things. And doesn't that impact the analysis? Um, it should be considered in the analysis, judge, absolutely. And I think that's part of our point here is it's not. None of that is in the analysis whatsoever in the district court's determination. And beyond that as well, to, I think, to one of the points I touched on earlier, um, some of these, some of these bits of information that are dredged up during the course of the investigation, uh, had this retaliatory, discriminatory investigation not been initiated, they would never have arisen. Those are the results of a fishing expedition that was discriminatory in our firm opposition. Okay. We'll give you time for a follow-up. Thank you much. Good morning. May it please the court, assistant United States attorney, Edrick Ching appearing, appearing on behalf of the secretary of the army. Um, at first I would like to, um, address, um, counsel's comment about, um, the lack of the, the lack of investigation into OTA's, um, February, 2016 comment. In fact, your honor, the record is clear that there was actually an investigation. Um, uh, Mr. Crow. Can you point us to where that is? Yes. Um, that would be at, um, that would be at, um, let's see, um, ER 323. 323? Yes. Okay. And what, and what is that? Um, it's, it's a, it's an email string. Um, it's a, I mean, it's a document string in which, uh, Mr. Crow complained to, uh, Mr. Guerrero about the, um, OTA comment in February, 2016. Um, Mr., um, um, Provost Marshall Guerrero then ordered, uh, SPO, which is Supervisory Police Officer Ballesteros to conduct an investigation. Um, and approximately within the next several days, um. And the investigation consisted of what? Um, SPO, that's SPO Ballesteros, um, confronted or SPO Ballesteros, um, spoke to, um, Officer Ota. Officer Ota admitted, you know, that he made the comment. He was given counseling. Did he talk, did, did, uh, did Ballesteros talk to anybody else? Um, there was no record of that, but however, a few days later, uh, Ballesteros did, um, you know, bring the parties together. You know, he, um, Officer Ota then apologized to, um, Mr. Crow and they shook hands. But a day prior to this meeting, um, Officer Ota in an email, which is, um, ER 420, 420, Officer Ota then apologized, um, to Mr. Crow for using those, for using the comment. And did he ever use the comments again? Um, there was no, there was no record of Mr. Ota, um, Officer Ota, um, using that comment again. And that probably goes to, um, the question that was posed to counsel as to why, um, Officer Ota was assigned to... But there were also comments, there were also, there's also some evidence in the record that Crow perceived that, that Ota said he would never work with him again, um, and that he said that Ota gave him the cold shoulder after that. Yes. Okay. So that, that evidence is, that there is evidence in the record of those things. Yes. But, um, with regard to, um, SPO Ballesteros's, um, decision to assign, um, Officer Ota to do the investigation, there's no, um, evidence, I believe, that, um, SPO Ballesteros was aware of that. That, that Ballesteros was aware of what? Um, that, that, that, um, Officer Ota made that comment about not working... So this is going to be a really hard point for you to defend. This is really bad judgment on Ballesteros's part. Yes. Is there any good justification for choosing a man who's just been reprimanded for, uh, for, for using, uh, homophobic slurs against his co-officer, uh, and then assigning him to conduct an investigation of that officer? What, what could possibly justify that? You didn't have any other officers at Tripler? Uh, well, Your Honor, just to point it out, um, um, SPO Ballesteros did ask two officers to, um, investigate. He asked, um, Ota, Officer Ota to take the four statements, but he also asked, he also, um, assigned Officer Kalpiko to take two statements that was of... That was, that was later on. Later on, yes. Much later on. Yes. Okay. And in addition to that, um, the, the record indicates that, um, SPO Ballesteros, he felt that, um, because the apology was made, they shook hands and everything, that, you know, there was no, um, you know, there was no animus or any type of, um, you know, hard feelings between them. In addition to that, um, I don't think there's anything in the record that Ballesteros knew that any further types of those comments were made. Okay. Can I ask about, because I guess this, they're trying to expand the hostile work, uh, claim here and, uh, based on their argument, but when you just go to the slurs themselves, we have the one slur at issue where he gets reprimanded and apologizes and cleans it up, but then the supervisor and I, Ballesteros. Yes. He was present during one of the... There's no dispute that those slurs were used previously as well, correct? Um, if you look at, um, the, the declaration set forth by, um, Mr. Crow in opposition to our motion for summary judgment, it states that, um, a comment was made by Officer Oda, not in the presence of Mr. Crow, but in the presence of other officers. It said that SPO Ballesteros was present, but it did not state that SPO Ballesteros, um, was present or heard the, heard those comments. So there's no... Well, he says that he was present in the class. This is, paragraph six. Yes. I recall taking a class on psychiatric patients on Veterans Affairs after the class and a few officers approached me, told me that Officer Oda had referred to me, um, using the slur, uh, more than once with him to my recollection, Chief Ballesteros was present in that class. Yes, but there's no, there's no evidence. There's nothing in the record to show that Chief SPO Ballesteros actually heard those comments. Was he asked about those comments? Was he asked about that in his deposition? Um, I, I don't believe so, Your Honor, but I mean, I would, you know, love to take the chance. I'm confused. Crow was present in that, that, uh, that meeting or not? Um, my, my, um, um, my recollection of the record was that another officer told Mr. Crow that Officer Oda was making these types of comments about you. So Crow was not present when Batiste, when he heard, when the supervisor heard of these, uh, heard, or arguably heard these comments? Yes. So at, at the district court hearing, um, we talked about... Can you help me just understand? And I, I, it's a little bit complicated. I know we're going back 10 years, but is this, is this common? I mean, it seemed to be, as they started to investigate it, that this was sort of like, I don't know if common is the right word to say it, but that it was not viewed internally as, as a derogatory comment. Is that changed in the department? Do you know? Uh, I, I'm not sure what, what, you know, what, what is going on in the department now, but, um... I mean, I'm just wondering if, if, if you heard that, why wouldn't there be some action taken? I mean, that, that's a little bit troubling to me and I'm trying to grapple with it. Yes. Uh, now your, your argument is there's no evidence he actually heard it. Yes. So, um, my argument is the first time of that SPO Ballesteros heard about Officer Oda using these types of, um, comments was in, in February, 2016. And, and just to make it clear, Your Honor, um, at the district court hearing, I believe a council admitted there were three comments that were made. The, the, the comment in mid 2015 that we're just discussing during the training, um, in January, 2016, while, um, um, Officer Oda and the plaintiff or Mr. Crow were watching somebody exit their car, um, Officer Oda made a comment about, you know, use that, the, the F, the F word, you know, in, in his presence. And then the third one is in, um, in February, 2016. What's, what's interesting to me, uh, and maybe you're the wrong person to ask, but I, I, there's, well, there's no evidence that the supervisor, at least we've said that in our prior opinion, there's no evidence that the supervisor knew of Crow's sexual orientation, even in February of 2016, right? Yes. Uh, what about Oda? Um, Oda also stated that he had, um, he did not have, um, knowledge of, um, he did not have knowledge of his sexual orientation. Didn't, didn't Crow tell him, tell Oda that he was, that he was bisexual? Yes, but, but that's what, um, that, that was a claim made by Mr. Crow, but Mr., um, Officer Oda in his, um, um, let's see, I believe it's ER 349, um, stated that, um, no, I'm sorry, ER 392, Officer Oda stated that he thought that, he believed that Mr. Crow was heterosexual when he did the interviews. When he did what interview? Uh, when, when he, when he interviewed. Investigation? Yes, when, when he interviewed the four witnesses during the investigation. He's already been, he's, he's, Oda's, I mean, sorry, Crow has already told Oda that he was bisexual at that point. He's already been reprimanded for using, for using those slurs. Yeah, but that's what Mr. Crow said that he told Oda that, but I guess Oda didn't, you know, when, when, when asked him to believe him. But at summary judgment, we would take the plaintiff's version of the story. Yes, and, and in addition to that, Your Honor, if you look at, um, um, if you look at, um, ER 416, that's, uh, Mr. Crow's EEO application. He stated in there, I am not gay. But he can be bisexual and that, I mean, that I'm not exactly sure, you know, how fluid all of this is, but, uh, but he admitted later on to, uh, to, uh, to both homosexual and heterosexual conduct. Correct. That was in his, that was in his deposition. I guess the, the question that I want to know is clearly by February of 2016, whether Oda believed it or not, Crow had made clear that, that he took offense to this because he, he, it was attacking him personally. That was his view of it in 2016 because he was bisexual. Um, is there any evidence that that had been communicated to Oda before February of 2016? I don't believe so, um, Your Honor. And in addition to that, um, does it, does it matter? Well, no, that's helpful. The other thing I'm struggling with is does it matter? Um, I don't think it matters. I mean, legal, I mean, in this case, it does not matter because once, um, Officer Oda was, um, you know, confronted with this, um, by, um, SPO Ballesteros, he apologized. And at that point, there were no further comments made by Officer Oda using that term. Is there any evidence that Officer Oda ever used this slur with any other officer? I, I don't believe... Crow is the only officer that, that he ever used this slur with. I, I, I don't believe there's anything in the record to indicate that he used it for any other, um, any other officer. Oda may, may have perceived something in, in Crow, even if Crow wasn't, wasn't out to him. Yes, but I, I believe in the, in the record, Oda stated that his interpretation of that, of the F word, it was not about homosexuality. It was about... Yeah, and I, I don't think we have to believe that. I don't think a jury would, I don't think a jury would have to believe that either. So I, I think if, if that's what you're resting on, I think that's going to be a jury question. Yep. So, so going back to Officer Oda, if you look at the statements that he did, um, if you look at, you know, um, the various statements, this is not a case in which, for example, he interviewed somebody and then he just did a summary. If you look at the, the four statements, which is from ER 373 to ER, I believe 386. In those statements, if you look at the way the statements were structured and you look at the testimony, um, they were, um, questions and answers and Oda testified that he would, you know, type out the question and that the, um, and the witness would then type out the answer. And I believe there's the initial next to each. So, so this is not a case of, um... Why didn't Oda interview, uh, Crow? Oh, Oda could not interview Crow because pursuant to union rules, a preliminary discussion, um, needed to be, um, scheduled with union, um, representatives there. And if you look at, um... Right. But that still doesn't explain why he didn't interview him. He could do so as long as there was a union representative there, right? Yes. Why Esteros could have, could have said, okay, I better, I better take this from here. Thank you for, for talking to everybody else. I, I need to talk with Crow myself. Yes. And, and Your Honor... Eventually does talk to him with the, with the union representative. And if you look at ER 425, uh, there appears to be some delays just because of people's schedule. So the, um, the interview of, um, Mr., the preliminary discussion occurred in June 2016. And if you look at the email trail, it's because, um, um, people had scheduling conflicts. What do we do, what do we do with the comments from both one of the officers who was interviewed, I don't remember which one, and Sewell, uh, that, uh, that both of them thought that, that a bigger deal, that OTA was making a bigger deal of this than, than was warranted. Sewell, Sewell certainly said this, this became a much bigger deal than I, than I intended. I didn't want this to be, I didn't want this to be a big deal. And one of the officers thought that, that Crow was a good officer and didn't understand why, why so much was being made out of all of this. Well, if you look at the way the statements are played out, if you look at the initial email from Sewell to his supervisor, Novosel at 338, that talks about, um, a confrontation in the Tripler Army Medical Center Emergency Department. And then it talks about how, um, you know, perhaps, um, Crow was spreading rumors to other people, including his wife at the VA. And then, then at that point when, um, and then it talked about a love triangle with, with Arnella, which is Arnella Garcia. Do you agree with the argument that your across the aisle made in terms of the Sewell complaint really being rooted in the spreading of rumors and not in any sort of threat of physical force? Well, well, in, in, in the Sewell complaint, um, he did say, he made a, I believe he made a comment about, um, that he feared for his safety. And that, um, I, I believe, I'm not 100% sure, but I believe. I'm trying to pin you down here. So is it the, is it your client's perspective that the nature or the root of that complaint by Sewell was sort of some sort of physical risk in the workplace? Yes. And then from there it evolved to, um, speaking to the two, um, VA employees, um, Ali, Sam, and Tabangura. And then when, when they spoke to them, then they learned about, um, information about gossiping for extended periods of time. They learned about, um, um, um. Is it fair to say that the physical threat aspect of this, if it existed at all, only traces back to the initial comment by Sewell, the, the initial report by Sewell? That's your only basis to point to that issue, is that right? Yes. And then, um, also with regard to the administrative duty, not only a physical threat to Sewell, but just a general physical, um, I mean, just a general issue about public safety, because, um, Garcia, in her statement says that when they had relations in the 10th floor Army Medical Center Training Center, that he would take, he would undo his, um, service belt, which I believe would also contain his revolver. And you're not supposed to, I believe, pursuant to regulations. Sounds like good, sounds like good reasons for terminating him. Yes. Which we've already approved. Yes, already approved in the, um, the 2023, um, opinion. Oh, I, I see the red light. And if. No, yet, I just want to make sure we don't have any more questions. I think, uh, uh, we've heard your argument, so. Thank you very much. Your Honors, um, if I may just, uh, address a few of the points raised here. I think most prominently the, uh, one of the disputes about the investigation, um, I do want to flag here, uh, on volume two of the extra records at page 216 and 217, actually, we have Ballesteros's, uh, testimony, uh, where he is asked, um, well, whether he actually investigated the allegations, uh, uh, made by OTA, and he responds, no. And he says, I didn't think of it, anything of it, really. And he's asked, you just took it at face value. And OTA, uh, excuse me, Ballesteros responds, he just said that it was mentioned, the, the slur, so I indicated that on my counseling. So, so Ballesteros actually testifies, concedes there was no actual investigation conducted into, uh, Crowe's allegations against OTA. Uh, another, I think, important point to flag here, uh, the nature of Sewell's complaint. That was a topic of discussion here, and I think that disagreement from my friend here, uh, is, is really indicative of the, that this is a material dispute effect. That, that issue, was it a, a concern of, of safety or not, that prompted, uh, uh, the investigation decision, at least purportedly. And so, that ties into this, this justification for the initiation of the investigation, that's a material dispute that needs to go to the jury, and it had no chance to do so here. Uh, another point I wanted to flag here, uh, briefly, related to the investigation, uh, there's a discussion of the three use of slurs against, uh, uh, Mr. Crowe. We don't actually know for certain that it was only three uses. It wasn't investigated. Uh, the record on that is sparse. Uh, uh, uh, Crowe was able to identify three, uh, and with the help of, uh, uh, notes from other individuals in the course of the proceedings that we, we made it through. But you haven't come up with any additional evidence? That's correct, Judge. Not in the record, at least. Of course, on the flip side, we do have evidence that Ballesteros and others in the workplace didn't think that this was a word that should be all that offensive. Like, maybe it's just a workplace word. So, and that's, I, uh, was my next point, Judge, actually, so I appreciate that, um, and, and that's a really important point, as well, here. That is a huge dispute of material fact, here, and there's actually some very substantive discussions, uh, in this, and because, actually, OTA calls this, um, uh, at, at pages 181 to 82, uh, in the volume two, uh, that the slur is just cop talk, just cop talk is what he calls it. But there's contrary testimony in the record directly refuting that. There's testimony from other officers at page 267, volume two, that it is not at all slur, a slur that is used, uh, they, they say it's not a slur that they throw around in a police department, and they, they confirm, I think it was mentioned previously, at, uh, page 263, OTA's repeated use of this slur. It's not something that, uh, anybody else throws around the station, and it is repeatedly and exclusively targeting Crow. It's, it's not a slur that they accept. It is not a slur that is appropriate. And there's no, and there's no evidence that, that OTA used this term regularly. For anyone else. For anyone else. That's correct, Judge. And I see my time has expired. Thank you, Your Honors. Thank you. Thank you to both counsel for your arguments in the case. The case is now submitted.
judges: BYBEE, NELSON, FORREST